J-S18001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.P., MOTHER | |
| | No. 179 EDA 2023 |

Appeal from the Order Entered December 16, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000946-2019

| | |
|---|---|
| IN THE INTEREST OF: T.L.-A.P.-A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.P., MOTHER | |
| | No. 180 EDA 2023 |

Appeal from the Decree Entered December 16, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000009-2022

| | |
|---|---|
| IN THE INTEREST OF: T.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.P., MOTHER | |
| | No. 181 EDA 2023 |

Appeal from the Order Entered December 14, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000947-2019

| | |
|---|---|
| IN THE INTEREST OF: T.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |

| | : | |
|---|---|---|
| APPEAL OF: V.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 182 EDA 2023 |

Appeal from the Decree Entered December 14, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000010-2022

| IN THE INTEREST OF: L.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 184 EDA 2023 |

Appeal from the Decree Entered December 16, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000011-2022

BEFORE:   PANELLA, P.J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:                    **FILED AUGUST 03, 2023**

In this consolidated appeal, V.P. ("Mother") appeals the Philadelphia Court of Common Pleas' decrees terminating her parental rights to her minor children, T.P., T.R. and L.P, and the court's orders changing T.P.'s and T.R.'s permanency placement goal from reunification to adoption. Appointed counsel has filed a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and

---

[*] Former Justice specially assigned to the Superior Court.

- 2 -

an application to withdraw from representation. We grant counsel's application to withdraw, and affirm the orphans' court's orders.

Mother has at least six children; however, this appeal concerns only three of Mother's children, T.R. (born in 2017), L.P. (born in 2019) and T.P. (born in 2011).[1] T.P. and L.P. are both placed in the same pre-adoptive foster home. T.R. is placed with a separate foster family, though two of his other siblings also live in that pre-adoptive home.

In 2016, the Philadelphia Department of Human Services ("DHS") received a General Protective Services ("GPS") report after Mother was late picking up one of her children from daycare and appeared intoxicated when she did arrive. Then, in February 2017, DHS received another GPS report after Mother gave birth to T.R. At that time, T.R. tested positive for cocaine and Mother tested positive for, among other substances, alcohol. DHS began in-home services through a Community Umbrella Agency ("CUA").

In May 2019, Mother once again failed to pick up her children, including T.P. and T.R., from daycare. CUA implemented safety plans for the children, and they were placed with either their material aunt or maternal grandmother. The children, including T.P. and T.R., were eventually reunited with Mother.

Mother gave birth to L.P. in December 2019, and DHS received another GPS report that same day. Mother admitted to using cocaine and alcohol

---

[1] T.R., T.P. and L.P. have different biological fathers, and none of the fathers are parties to this appeal.

during her pregnancy with L.P. DHS once again developed a safety plan for the children and eventually obtained an Order for Protective Custody for the children, including T.R., T.P. and L.P., and they were placed in foster care.

DHS filed dependency petitions for the children, and on March 12, 2020, T.R., T.P. and L.P. were adjudicated dependent and committed to the custody of DHS. Mother was given line-of-sight and line-of-hearing supervised visitation, and ordered, among other things, to undergo random drug and alcohol screens and was referred for mental health and substance abuse treatment and parenting education.

After a permanency review hearing in September 2020, the court found Mother had missed nine out of ten visits with her children. Mother continued to cancel or miss her visits, and the court found after a November 2021 permanency review hearing that Mother had been minimally compliant with the permanency plan.

CUA also revised Mother's single case plan in November 2021, outlining several objectives for Mother, including that she participate in CUA services, participate in outpatient mental health and substance abuse treatment, and attend the supervised visits with her children. Mother continued to fail to meet her objectives.

On January 5, 2022, DHS filed a petition to involuntarily terminate Mother's parental rights to T.R. The orphans' court held a hearing on

September 28, 2022, which Mother did not attend.[2] At the hearing, Crystal Atkins, the CUA supervisor for the family, testified. She explained that DHS initially became involved with Mother and the children because there were parental capacity and substance abuse concerns with Mother. **See** N.T., 9/28/2022, at 9. Atkins reported Mother's visitation with her children, including T.R., had been inconsistent at best, with Mother frequently canceling the scheduled visits. **See id.** at 16-17, 19. In fact, Atkins recounted that Mother had not visited with the children, including T.R., since May 2022. **See id.** at 20.

Atkins testified Mother failed to attend her random substance screens, and she suspected Mother attended visits with her children while high. **See id.** at 21-22. Atkins also stated she had seen Mother actively using drugs. **See id.** She reported that, to her knowledge, Mother was not currently enrolled in nor had she completed any drug or alcohol or mental health treatment program. **See id.** at 22-23, 24.

Atkins rated Mother's compliance with her single case plan objectives as "none" and rated her progress towards alleviating the circumstances which brought T.R. into care as "none." **See id.** at 29. Atkins testified T.R. does not ask to see Mother, and would not, in her opinion, suffer irreparable harm

_____

[2] We point out that the notes of testimony from this hearing were not included in the certified record originally sent to this Court. However, upon informal inquiry, our Prothonotary was able to obtain the notes of testimony, and subsequently placed them in the certified record.

should termination occur as Mother and T.R. do not have a parent-child bond. *See id.* at 30, 45.

At the end of the hearing, the court found Mother had not "demonstrated any willingness to comply with her single case plan objectives in any meaningful way." *Id.* at 76. The court further found DHS had presented clear and convincing evidence that Mother's parental rights to T.R. should be terminated pursuant to 23 Pa. C.S.A. § 2511 (a)(1), (a)(2), (a)(5) and (a)(8) and (b). However, the court held the best interest analysis pursuant to Section 2511(b) in abeyance to see if it was possible to discern T.R.'s wishes regarding adoption.

The court then held another hearing on December 14, 2022, to determine whether termination was in the best interests of T.R. The court heard testimony from Atkins[3] that T.R. was doing well in his pre-adoptive foster home, where his needs were being met and he had a loving relationship with his foster father. *See* N.T., 12/14/2022, at 6-7.

Roya Paller, the family's caseworker, also testified. According to Paller, given Mother's inconsistent visitation, there is "nothing to cut off" as far as a bond between Mother and T.R. *See id.* at 14, 15. Paller reported T.R. is happy in his current foster home, where his needs are being met and where two of his siblings live. *See id.* at 12-13; *id.* at 13 (Paller stating, "He's so excited to

---

[3] The notes of testimony from this hearing mistakenly spell Atkins's last name as "Adkins."

be with his sisters."). In addition, Paller stated that T.R. called his foster father "Dad." *See id.* at 13.

Paller informed the court she had spoken to T.R. about adoption. Although T.R. was only five years old and had an educational IEP, Paller testified T.R. was nonetheless "able to clearly identify who he wanted to be with." *Id.* He expressed that he wanted to remain with his foster father and siblings and wanted his foster home to be his "forever" home. *See id.* at 13, 14; *Id.* at 15 (Paller agreeing that T.R.'s "whole world is right there" with his foster dad and siblings). Paller testified the foster father wishes to adopt T.R., as well as the two siblings. *See id.* at 14.

The orphans' court reiterated it had previously found DHS had proven four statutory grounds for termination pursuant to Section 2511(a). The court then also found it was in the best interests to terminate Mother's parental rights to T.R. In support, the court noted that T.R. had no parental relationship with Mother. *See id.* at 18. Instead, he looked to his foster father, whom he called "Dad," to meet his needs, and the foster father was meeting all of those needs in his "loving pre-adoptive home." *Id.* The court entered a decree terminating Mother's parental rights to T.R. that same day, on December 14, 2022.[4] It also entered an order changing T.R.'s permanency placement goal to adoption.

---

[4] The court also involuntarily terminated T.R.'s biological father's parental rights.

DHS also filed a petition to involuntarily terminate Mother's parental rights to T.P. and another petition to terminate her parental rights to L.P. on January 5, 2022. The court held a hearing on these petitions two days after it terminated Mother's parental rights to T.R., on December 16, 2022.

Atkins, the family's CUA supervisor, also testified at this hearing. She reported Mother had stopped cooperating with CUA around May 2022. **See** N.T., 12/16/2022, at 14. According to Atkins, Mother had also not visited T.P. or L.P. since May 2022 and her visits were inconsistent before that. **See id.** at 14, 16, 18. Like she had at the termination hearing for T.R., Atkins testified she had concerns Mother was under the influence of substances when she did visit the children, and that she was aware Mother was currently using drugs. **See id.** at 20. Atkins reported Mother had never provided documentation that she had completed any drug and alcohol treatment, or provided any clean drug or alcohol screens. **See id.** at 20, 21.

Atkins once again rated Mother's compliance with her single case plan objectives as "none," and rated her progress towards alleviating the circumstances that led to placement of T.P. and L.P. as "none." **Id.** at 25-26.

Atkins further testified that T.P., who was in the fifth grade at the time, was happy and doing well in her foster home and called her foster mother "Mom." **See id.** at 31-32. Atkins believed it was in the best interests of T.P. to be adopted. **See id.** at 31. Atkins stated she would rule out reunification,

and that although T.P. was "aware" of Mother, she wanted to be adopted by her foster mother. *See id.* at 26.

Caseworker Paller also testified at this hearing. She reported T.P. "very much wanted to be adopted." *Id.* at 35. Paller did not have any doubts that T.P. should be adopted by her foster mother, who is "absolutely willing" to adopt T.P. *Id.* at 38.

As for L.P., Atkins noted that L.P., who was three years old, had been in care since he was only a few weeks old. *See id.* at 85. Atkins stated that L.P. looked to his foster mother for all of his needs, and called her "Mom." *See id.* at 81, 82. The foster home "is all that he knows." *Id.* at 26. In her opinion, L.P. would not suffer any harm if Mother's rights to him were terminated as the two had no bond. *See id.* at 26, 80-81. Paller essentially echoed this testimony, adding that when she spoke with L.P. about adoption, it was clear he identified his foster mother as his mom and this was the home he wanted to be in as it was the only home he had ever known. *See id.* at 92-93.

Mother appeared in the middle of the hearing and acted disruptive throughout the rest of the hearing. She did testify. She admitted she had not visited her children since at least July 2022. *See id.* at 43. She conceded she was no longer participating in mental health treatment, nor was she actively engaged in drug and alcohol treatment. *See id.* at 45-46, 58. She also told the court she was pregnant, but had nonetheless continued drinking and had consumed alcohol as recently as the day before the hearing. *See id.* at 50,

58, 64. She testified she tried to have L.P. see her as a friend, and had not seen L.P. since "springtime" or "March." *See id.* at 96-97. She offered a wide variety of reasons for her noncompliance with her objectives throughout her testimony.

Following the close of testimony, the court found DHS had proven Mother's conduct warranted termination of her parental rights to T.P. pursuant to Section 2511 (a)(1), (a)(2), (a)(5) and (a)(8) and (b), and it entered an order to that effect the same day.[5] In addition, the court entered an order changing T.P.'s permanency placement goal to adoption.

As for L.P., the court entered another order terminating Mother's parental rights to L.P., also pursuant to Section 2511 (a)(1), (a)(2), (a)(5) and (a)(8) and (b). The court, however, retained L.P.'s placement goal as "return to guardian" so that CUA could engage in outreach with L.P.'s biological father, who was incarcerated. *See* Permanency Review Order, 12/16/2022, at 2.

Mother filed a notice of appeal from each of the orders terminating her parental rights to T.R., T.P. and L.P., as well as from the orders changing T.R. and T.P.'s permanency placement goal to adoption. Mother attached her Pa.R.A.P. 1925(b) statement to each of the orders. In response, the court issued three separate Rule 1925(a) opinions, one each for T.R., T.P. and L.P.,

---

[5] The court also entered an order terminating T.P.'s biological father's parental rights to her.

referring this Court to the statements it made on the record at the termination hearings to support its rulings.

This Court subsequently entered an order consolidating the matters. Counsel filed an application to withdraw, as well as an **Anders** brief, asserting that Mother did not have any non-frivolous issues to raise on appeal.

As a threshold matter, we have reviewed counsel's brief and application and conclude that they meet the requirements set forth for counsel seeking to withdraw from representation in involuntary termination matters. **See Commonwealth v. Orellana**, 86 A.3d 877, 879-880 (Pa. Super. 2014); **In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending **Anders** briefing criteria to first appeals by indigent parents represented by court-appointed counsel in involuntary termination matters).[6] Accordingly, we turn to our own review of the appeal to determine if it is wholly frivolous. **See Commonwealth v. Wrecks,** 931 A.2d 717, 721 (Pa. Super. 2007) (stating

_____

[6] Specifically, counsel seeking to withdraw from representation under **Anders** must file a brief that: 1) provides a summary of the procedural history and facts; 2) refers to anything in the record that counsel believes arguably supports the appeal; and 3) sets forth counsel's conclusions that the appeal is frivolous, and the reasons for that conclusion. **See id.** Counsel must also provide a copy of the **Anders** brief to her client, with an accompanying letter that advises the client of her right to: 1) retain new counsel to pursue the appeal; 2) proceed _pro se_; or 3) raise additional points deemed worthy of the Court's attention. **See Orellana,** 86 A.3d at 880. Mother's counsel's original letter was insufficient, and this Court entered an order on April 21, 2023 directing counsel to send a new letter to Mother complying with the requirements of **Anders**, along with a copy of the **Anders** brief and a copy of counsel's application to withdraw. Counsel responded to the Court's order on April 27, 2023, and the response substantially complies with the Court's order.

that once this Court determines that counsel's application and brief satisfy ***Anders***, the Court must then conduct its own review of the appeal to determine if it is wholly frivolous).

In doing so, we agree with Mother's counsel that there are no non-frivolous issues to raise on appeal. In her ***Anders*** brief, counsel identified two potential issues for appeal, essentially that the orphans' court erred by finding that DHS had presented sufficient evidence to support four of the statutory grounds for termination under Section 2511(a) and had erred by finding that termination and a goal change was in the children's best interests.

When this Court reviews an order of an orphans' court terminating parental rights, we must accept the findings of fact and credibility determinations of the court as long as the record supports them. ***See In the Interest of D.R.-W.***, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the orphans' court made an error of law or abused its discretion. ***See id***.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. Under Section 2511, the orphans' court must engage in a bifurcated process prior to terminating parental rights. ***See In re L.M***., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the court must find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). ***See id.***; 23 Pa.

C.S.A. § 2511 (a)(1-11). If the orphans' court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. **See In re L.M.**, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court found DHS had proven by clear and convincing evidence that Mother's conduct met the grounds for termination of her parental rights to T.R., T.P. and L.P. under Section 2511 (a)(1), (a)(2), (a)(5) and (a)(8). This Court need only agree with the orphans' court that DHS met its burden as to any one subsection in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we conclude the orphans' court correctly determined DHS met its burden pursuant to Section 2511 (a)(8), which provides that parental rights may involuntarily be terminated on the grounds that:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Under Section 2511(a)(8), then, DHS was required to produce clear and convincing evidence that: (1) T.R., T.P. and L.P. had been removed from

- 13 -

Mother's care for at least 12 months; (2) the conditions which led to the removal of T.R., T.P. and L.P. continue to exist; and (3) the termination of Mother's parental rights would best serve the needs and welfare of T.R., T.P. and L.P. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003). We have explained that:

> Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the [children's] removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations and quotation marks omitted).

Here, the orphans' court noted that T.R., T.P. and L.P. had been removed from Mother's care for well over twelve months, given that they were removed from her care in January 2020 and the termination hearings took place in September and December 2022. As to whether the conditions that led to their removal continued to exist, the court noted that Mother had completely stopped visiting the children on the heels of what had been very inconsistent visitation, continued to drink and had continued substance abuse concerns despite being pregnant, and failed to engage in her case plan objectives in any meaningful way.

The record supports these conclusions. Therefore, like Mother's counsel, we see no abuse of discretion or error of law in the orphans' court's conclusion that T.R., T.P. and L.P. had been out of care for almost three years and therefore way longer than the 12-month timeframe prescribed by Section 2511 (a)(8) and that the conditions which led to the placement of the three children continue to exist. Accordingly, we agree the orphans' court did not err in concluding DHS had established the first two prongs of the Section 2511(a)(8) test.

The third prong of the test under Section 2511(a)(8) required the orphans' court to determine that termination of Mother's rights would best serve the needs and welfare of T.R., T.P. and L.P. As noted above, Section 2511(b) also required the court to conduct a needs and welfare analysis of T.R., T.P. and L.P.

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). In determining a child's needs and welfare, the orphans' court is required to consider "whatever bonds may exist between the children and [the natural parent], as well as the emotional effect that termination will have upon the children." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (citation omitted). At the same time, the court should also consider the intangibles,

such as the "love, comfort, security, and stability," the child might have with the foster parent. ***In re K.Z.S.***, 946 A.2d 753, 760 (Pa. Super. 2008) (citation omitted).

Here, the orphans' court found that there was no evidence to support a finding that any parent-child bond existed between Mother and any of the three children, T.R., T.P. or L.P. Mother had completely stopped visiting the children months before the termination hearings took place and even told the court she tried to have L.P. see her as a friend rather than a parent.

Moreover, as the orphans' court noted, there was testimony credited by the orphans' court that T.R., T.P. and L.P. were all doing well in their foster home, and had bonded with their foster parent, with T.R. calling his foster father "Dad" and T.P. and L.P. each calling their foster mother "Mom." L.P. viewed his foster home as his "forever home" and T.R. and T.P. both indicated they wished to remain with, and be adopted by, their respective foster parent.

Based on all of these factors, the orphans' court found that it was in the best interests of T.R., T.P. and L.P. to terminate Mother's parental rights. Again, we agree with Mother's counsel that there is no abuse of discretion or error in this conclusion, which is amply supported by the record.

We also agree with Mother's counsel to the extent she asserts in her ***Anders*** brief that any claim Mother would raise that the orphans' court erred by changing T.R.'s and T.P.'s permanency placement goals to adoption would not warrant any relief.

In considering a petition for goal change, a court shall consider: 1) the continuing necessity for and appropriateness of the placement; 2) the extent of compliance with the single case plan objectives; 3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; 4) the appropriateness and feasibility of the current placement goal for the child; and 5) a likely date by which the goal of the child might be achieved. **See In re S.B.**, 943 A.2d 973, 977 (Pa. Super. 2008); **see also** 42 Pa.C.S.A. § 6351(f). The court must focus on the safety, permanency, and well-being of the child, **see In re S.B.,** 943 A.2d at 978 (citation omitted), and the agency seeking the goal change, DHS in this case, must demonstrate that changing the child's goal to adoption would be in the best interests of the child. **See In re R.I.S.**, 36 A.3d 567, 573 (Pa. 2011).

Here, for all of the reasons discussed above, we can discern no abuse of discretion in the court's conclusion that it was in the best interests of T.R. and T.P. to change their permanency placement goal to adoption. **See In re A.K.**, 936 A.2d 528, 532-533 (Pa. Super. 2007) (stating that the appellate court must employ an abuse of discretion standard of review when reviewing an orphans' court's order changing a dependent child's placement goal to adoption). To recap in brief, the children were removed from Mother's care for almost three years and yet, the orphans' court found Mother had made no progress in alleviating the circumstances which led to their removal. In

addition, both T.R. and T.P. are with loving foster parents who wish to adopt them and give them the stability and permanency they deserve.

In sum, we agree with Mother's counsel that the record supports the orphans' court's orders on appeal and there are no non-frivolous issues to raise on appeal. We therefore grant counsel's application to withdraw from representation, and affirm the orders terminating Mother's parental rights to T.R., T.P. and L.P. and the orders changing T.R. and T.P.'s permanency placement goal to adoption.

Application to withdraw granted. Orders affirmed.

President Judge Emeritus Stevens joins the memorandum.

Judge Dubow did not participate in the consideration.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 8/3/2023*